**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Thomas B. McNamara

In re:

J.R. BUTLER, INC.,

Debtor.

Bankruptcy Case No. 25-15598 TBM
Chapter 11

_____

**ORDER GRANTING MOTION TO CONVERT CHAPTER 11 REORGANIZATION TO
CHAPTER 7 LIQUIDATION**

_____

### I.　　Introduction.

The Debtor, J.R. Butler, Inc. (the "Debtor"), is a monumental glass and glazing construction company formed more than 30 years ago.  Although successful for decades, it ran into severe financial problems as a result of the COVID pandemic, increases in the price of manufacturing inputs, uncompensated construction delays, and labor shortages.  On June 6, 2025, the Debtor laid off all of its employees and ceased new business operations.  Then, it sold all its physical assets and intellectual property to a new entity formed by the Debtor's principals for $240,000.  The new company operates in the same industry as the Debtor.  The Debtor spent most of the money even though the assets and proceeds served as secured collateral for its lender, SMS Financial CRE Fund, LLC ("SMS").  Later, on August 29, 2025, the Debtor filed for protection under Chapter 11 of the Bankruptcy Code[1] on April 21, 2025.  At the time that it entered bankruptcy, the Debtor: had no employees; no active business; few assets (mainly unpaid accounts receivable); and no intent to reorganize its operations.  During the pendency of the Debtor's bankruptcy case (about nine months), the Debtor has not received any income, has accrued substantial unpaid administrative expenses, has not collected any accounts receivable, and has not confirmed a plan of reorganization.  Put another way, the Debtor has achieved no positive results.

On November 25, 2025, one of the Debtor's secured creditors, SMS, filed a "Motion to Dismiss Chapter 11 Bankruptcy or In the Alternative to Convert to Chapter 7" (the "Motion to Convert").[2]  SMS asks that the Debtor's bankruptcy case be converted from Chapter 11 reorganization to Chapter 7 liquidation.  Citing Sections 1112(b)(1) and

---

[1]　　11 U.S.C. § 101 et seq.  Unless otherwise indicated, all references to "Section" are to Sections of the Bankruptcy Code.

[2]　　Docket No. 110.  Unless otherwise indicated, the Court will refer to documents from the CM/ECF docket for the main Bankruptcy Case, *In re J.R. Butler, Inc.*, Case No. 25-15598-TBM (Bankr. D. Colo.) using the convention: "Docket No. ___."  Although SMS initially requested the remedies of dismissal *or* conversion, later, SMS argued for conversion to Chapter 7 liquidation.  Accordingly, the Court refers to SMS' filing as the "Motion to Convert."

(b)(4)(A), SMS argues that there is a "substantial or continuing loss to or diminution of the [e]state" and no "reasonable likelihood of rehabilitation." Additionally, SMS contends that the Debtor filed for bankruptcy protection with "a lack of good faith." The Debtor filed an "Objection" (the Objection)[3] opposing the Motion to Convert. Another creditor joined the Motion to Convert.[4] The Court conducted a trial on the Motion to Convert on November 24, 2025, during which it received witness testimony and admitted numerous exhibits. For the reasons set forth below, the Court determines that there is cause for conversion under Sections 1112(b)(1) and (b)(4)(A). So, the Court grants the Motion to Convert.

## II.      Jurisdiction and Venue.

This Court has jurisdiction to enter final judgment on the Motion to Convert and Objection pursuant to 28 U.S.C. § 1334. A motion to dismiss or convert a Chapter 11 case for "cause" under Section 1112(b) is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) (matters concerning administration of the estate) and (b)(2)(O) (other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor relationship). Furthermore, no party has contested the Court's exercise of jurisdiction and entry of final judgment on the Motion to Convert and Objection. So, the Court finds that it has jurisdiction to enter final judgment on the Motion to Convert and Objection. No party challenged the Debtor's choice of venue in the District of Colorado. Thus, the Court finds that venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.      Procedural Background.[5]

On August 29, 2025 (the "Petition Date"), the Debtor filed for relief under Chapter 11 of the Bankruptcy Code.[6] About three months later, on November 25, 2025, SMS submitted the Motion to Convert.[7] On December 19, 2025, the Debtor filed the Objection opposing the Motion to Convert.[8] At the joint request of SMS and the Debtor, the Court rescheduled and deferred initial consideration of the Motion to Convert and Objection to facilitate settlement efforts.[9] However, after the dispute was not resolved, the Court set the contest for trial.[10] The parties engaged in discovery. In advance of the trial, SMS and the Debtor submitted "Stipulated Facts and Exhibits for Hearing on

---

3      Docket No. 149.
4      Docket No. 220.
5      The Court takes judicial notice of the Docket. *See St. Louis Baptist Temple, Inc. v. F.D.I.C.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (court may *sua sponte* take judicial notice of its own docket and "in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to the matters at issue.").
6      Docket No. 1; Ex. 1.
7      Docket No. 110.
8      Docket No. 149.
9      Docket Nos. 172, 179, and 183.
10     Docket No. 183.

Motion to Dismiss or Convert," wherein the parties stipulated to four facts (the "Stipulated Facts") and the admissibility of certain exhibits.[11]

On April 20, 2026, the Court conducted the trial on the Motion to Convert and Objection.  During the trial, the Court received the testimony of three witnesses: Marc Butler (the Debtor's Chief Executive Officer); Matthew Calkins (the Debtor's Chief Operations Officer); and Kyler Kienholz (the Managing Director of Operations and Real Estate of SMS).  The Court admitted SMS' Exhibits 1, 2, 6-11 and 13 plus the Debtor's Exhibits A-C and E.[12]  SMS and the Debtor presented comprehensive closing arguments.  SMS argued for the remedy of conversion to Chapter 7 rather than dismissal under Section 1112(b)(1).  At the conclusion of the trial, the Court took the Motion to Convert and Objection under advisement but also ordered supplemental legal briefing on interpretation of the term "rehabilitation" in Section 112(b)(4)(A).  The parties complied and filed their supplemental legal briefs.[13]

There have been a handful of post-trial developments.  On April 28, 2026, the Debtor filed a belated "Plan of Liquidation" (the "Liquidation Plan")[14] and a "Disclosure Statement" (the "Disclosure Statement").[15]  Given the pendency of the Motion to Convert and Objection, the Court has not acted on the Liquidation Plan and Disclosure Statement.  As a result, the Court has not approved the adequacy of the Disclosure Statement and has not confirmed the Liquidation Plan.  Nevertheless, the Court observes that the Liquidation Plan proposes that the Debtor liquidate its only material remaining assets: accounts receivable.  Neither the Disclosure Statement nor the Liquidation Plan identify any amounts which are projected to be paid to general unsecured creditors.

Later still, another creditor, J.E. Dunn Construction Company ("J.E. Dunn"), submitted a "Joinder to SMS Financial CRE Fund, LLC's Motion to Dismiss Chapter 11 Bankruptcy or in the Alternative to Convert to a Chapter 7 and Movant's Brief Regarding the Meaning of 'Rehabilitation' under 11 U.S.C. § 1112(b)(4)(A)" (the "Joinder").[16]  The Joinder contains no additional facts, evidence, or legal argument.  Instead, the Joinder states only that J.E. Dunn "joins SMS in requesting that this Chapter 11 case be converted to Chapter 7 for cause shown pursuant to 11 U.S.C. § 1112(b)(4)(A)."[17]  The Debtor took umbrage with the Joinder mainly on timeliness grounds and filed an "Objection to J.E. Dunn's Joinder to SMS Financial's Motion to Dismiss or Convert Case") (the "Joinder Objection").[18]  The Debtor contended that "the Court should deny . . . the Joinder to the extent that it purports to add new facts, evidence, or arguments beyond those already presented . . . ." and "should be disregarded."[19]  But, the Joinder

---

11      Docket No. 209.
12      Docket No. 211.
13      Docket Nos. 211, 217 and 218.
14      Docket No. 215.
15      Docket No. 216.
16      Docket No. 220.
17      *Id.*
18      Docket No. 225.
19      *Id.* at 1 and 4.

did not add any new facts, evidence, or arguments.  And, subsequently, J.E. Dunn clarified that it filed the Joinder "solely to express its preference, as a creditor, that the case be converted to Chapter 7 rather than dismissed should the Court find cause under 11 U.S.C. § 1112(b)(1)."[20]  Although belated, the Court ascertains no impediment in J.E. Dunn expressing its preference if the Court finds cause under Section 1112(b)(1).  And there is no prejudice to the Debtor in the Court considering the Joinder either since, as set forth below, the Debtor is not entitled to weigh in on the remedy once cause is proven anyway.  Thus, the Court accepts the Joinder for its stated and relatively benign purpose: to show that J.E. Dunn prefers conversation to Chapter 7 liquidation rather than dismissal if the Court finds cause under Section 1112(b)(1).  The Court overrules the Joinder Objection.

In any event, in the interval since the trial, the Court has evaluated all the admitted exhibits, reviewed the testimony of witnesses, and considered the applicable law under Section 1112(b).  The issues raised in the Motion to Convert and Objection are now ripe for decision.

## IV.   Factual Findings.

The Court makes the following factual findings under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052 and 9104(c), based upon the testimony of the witnesses and the exhibits admitted at the trial.

## A.   The Debtor's Formation and Business Operations.

The Debtor is a Colorado corporation formed more than thirty years ago by its Chief Executive Officer, Marc Butler, as a monumental glass and glazing construction contractor.  As of the Petition Date, Marc Butler and an affiliated trust owned 79.85% of the equity in the Debtor.[21]  Mr. Butler controlled the Debtor's business activities.  Matt Calkins, the Debtor's Chief Operations Officer, and affiliated trusts held 19.97% of the equity in the Debtor.[22]  Three other individuals owned the remaining nominal equity in the Debtor.[23]

The Debtor's principal place of business was located at 8535 Highfield Parkway No. 100, Englewood, Colorado (the "Debtor's Facility").  However, the Debtor's business was national in scope.  The Debtor, mainly designed, engineered, manufactured, and installed glass and glazing on large commercial buildings such as high-rise structures or "skyscrapers."  Most of the Debtor's work was on the non-load bearing exterior façade sometimes referred to as the "curtain wall."  But the Debtor also handled all the other glass elements required for monumental construction, including interior glass and mirrors.  At its peak, the Debtor employed over 500 personnel.  The Debtor operated exclusively as a glass and glazing subcontractor engaged by general contractors on

---

[20]     Docket No. 227 at 1.
[21]     Ex. 6 at 11-12.
[22]     *Id.*
[23]     *Id.*

projects. In other words, all its direct clients or customers were general contractors, not project or building owners.

The Debtor generated significant revenues for decades. However, it faced significant challenges as a result of the COVID pandemic. Because of supply chain disruptions, the price of glass and aluminum, the Debtor's primary manufacturing inputs, surged dramatically. Prices doubled. Unfortunately, as a subcontractor, the Debtor was unable to pass on or recover such increased costs under its contracts with general contractors. The COVID pandemic also caused substantial uncompensated construction delays, and labor shortages. Later, because of the increase in remote work, the market for new high-rise office structures also deteriorated.

B.      **The Debtor's Bankruptcy Filing, Assets, and Liabilities.**

The Debtor tried to hold on. In 2023, the Debtor generated $64,362,492 in gross revenue.[24] By 2024, it faired a little better: $74,275,996 in gross revenue.[25] But, the Debtor's financial condition became more and more precarious with increased costs and less new business. The Debtor ran into a severe cash crunch. It reached out to asset-backed lenders, special purpose vehicles, and other potential sources of capital. The Debtor paid a $50,000 finder's fee and had a promising lead on a possible $50,000,000 infusion of capital. However, the transaction evaporated over the Memorial Day weekend of 2025.

The Debtor made the difficult decision to close. On June 6, 2025, the Debtor laid off all its employees and ceased new business operations. The Debtor tried to resolve payroll and tax issues. Then, a few months later, on the Petition Date (August 29, 2025), the Debtor filed for Chapter 11 bankruptcy protection. When it filed for bankruptcy, the Debtor was in a wind-down phase and did not intend to continue to operate. But the Debtor anticipated collecting its outstanding accounts receivable. Through bankruptcy, the Debtor sought to liquidate, not reorganize and continue its business operations.

On the assets side of its ledger (Schedule A/B), as of the Petition Date, the Debtor listed $7,000,000 in outstanding accounts receivable.[26] Its only other assets were nominal: $17,000 in cash in a bank account[27]; and $100,000 of equipment.[28]

The Debtor's debt dwarfed its assets. On its Schedule D, the Debtor identified a $35,018,369.24 secured debt owed to SMS.[29] Per its Schedule E/F, the Debtor owed

---

[24]     Ex. 6 at 1.
[25]     *Id.*
[26]     *Id.* at 15.
[27]     *Id.* The $17,000 listed on the Debtor's Schedule A/B is contradicted by the Debtor's later reportings showing that it held $39,349.06 on August 31, 2026.
[28]     *Id.* at 16.
[29]     *Id.* at 19.

at least $10,069,847.40 to general unsecured creditors.[30]  Subsequently, 126 secured, priority, and unsecured creditors filed proofs of claim aggregating $64,915,226.74. Among its largest creditors: (1) SMS filed Proof of Claim No. 88-1 ($3,465,873.10), Proof of Claim No. 89-1 ($424,097.55), Proof of Claim No. 91-1 ($13,492,204.13), Proof of Claim No. 92-1 ($11,787,217.05), and Proof of Claim No. 93-1 ($424,097.55); (2) J.E. Dunn filed Proof of Claim No. 110-1 ($3,039,596); and (3) Employers Mutual Casualty Company filed Proof of Claim No. 111-1 ($12,449,088).[31]

## C.      The SMS Debt.

SMS is a "complex asset manager."  Typically specializing in real estate, SMS acquires underperforming debt, loans collateralized by real estate, and judgments. Kyler Kienholz is the Managing Director of Operations and Real Estate of SMS.

Prior to the Petition Date, the Debtor's principal secured lender was Citywide Banks, a division of HTLF Bank, N.A. ("Citywide Banks").  Over time, the Debtor took out millions in loans from Citywide Banks.  Those loans were subsequently assigned to SMS.[32]  Prior to the Petition Date, the Debtor executed a Forbearance Agreement with SMS acknowledging the existence and assignment of the loans.[33]  As set forth above, SMS filed multiple Proofs of Claim against the Debtor.  The Debtor and SMS stipulated that "the Debtor and related *non-debtor obligors* owe approximately $35,000,000 in the aggregate." (Emphasis added.)[34]  The debt owed to SMS is secured by all the Debtor's assets.[35]

## D.      Debtor's Post-Petition Operations and Activities.

Months prior to the Petition Date, the Debtor laid off all its employees and ceased active operations.  Per Mr. Calkins, the Debtor "closed" on June 6, 2025.  It is no longer designing, engineering, manufacturing, or installing glass and glazing on large commercial buildings.  And the Debtor is not seeking new contracts or business operations.

As of the Petition Date, the Debtor had $39,349 in cash.[36]  Since the Petition Date (August 29, 2025), the Debtor has earned no gross operating income.  The Debtor's Monthly Operating Reports[37] show the following:

---

[30]     *Id*. at 30.
[31]     Exs. 1 and 2; and Claims Register.
[32]     Stip. Fact No. 1.
[33]     Stip. Fact No. 2; Ex. 9.
[34]     Stip. Fact Nos. 3 and 4.  The Court observes that the $35,000,000 figure stipulated by the Debtor and SMS does match closely to the filed Proofs of Claim.  The Proofs of Claim filed by SMS against the Debtor aggregate $29,593,486.  The discrepancy appears to be that related or affiliated entities owe SMS additional sums.  *See* Ex. 9.  However, it is immaterial to the Motion to Convert since SMS is the largest secured creditor of the Debtor, no matter the calculation of debt.
[35]     *See* Ex. 1 and 2.
[36]     Docket No. 108.
[37]     Docket Nos. 68, 108, 109, 159, 174, 193, 199, 219, and 226.

| Month Ended | Beginning Cash Balance | Receipts | Disbursements | Ending Cash Balance |
|---|---|---|---|---|
|  |  |  |  |  |
| Aug. 2025 | $39,349.[38] | $0 | $0 | $39,349 |
| Sept. 2025 | $39,349 | $18,781.[39] | $40,493.[40] | $17,637 |
| Oct. 2025 | $17,637 | $0 | $0 | $17,637 |
| Nov. 2025 | $17,637 | $0 | $0 | $17,637 |
| Dec. 2025 | $17,637 | $0 | $0 | $17,637 |
| Jan. 2026 | $17,637 | $0 | $0 | $17,637 |
| Feb. 2026 | $17,637 | $0 | $0 | $17,637 |
| Mar. 2026 | $17,637 | $0 | $0 | $17,637 |
| Apr. 2026 | $17,637 | $0 | $505.[41] | $17,132 |

The Debtor's cash held on the Petition Date constituted SMS' secured cash collateral.  The Debtor did not ask for or receive permission from the Court to use post-petition cash collateral under Section 363(c)(2).  Nevertheless, the Debtor spent $40,490 in cash collateral on an unauthorized post-petition basis.[42]

Meanwhile, the Debtor reported incurring $121,635 in unpaid post-petition liabilities.[43]  Notably, the Debtor has not reported on its Monthly Operating Reports the amount of post-petition attorneys' fees it owes its current bankruptcy counsel, Michael Best & Friedrich LLP ("Michael Best").  At trial, Matthew Calkins testified that he and Marc Butler were paying Michael Best.  In its Disclosure Statement, the Debtor, for the first time, stated:  "Since the Petition Date, non-Debtor parties Marc Butler and the Greta Valentinova Calkins 2021 Irrevocable Trust Dated Oct. 1st 2021 have paid certain Administrative Expenses of the Debtor, including Professional fees."[44]  The Debtor and its legal counsel have not provided adequate information or disclosures concerning any such payments of the Debtor's administrative expenses by third-parties.

Since the Debtor is no longer in business, its only avenue to make any payments to creditors is collection of its accounts receivable.  The Debtor contends that it is owed an aggregate of $6,881,836 in outstanding accounts receivable spread across thirteen pre-bankruptcy construction projects.[45]  Some of the accounts receivable date back to

---

[38]     Docket No. 108 at 11 showing an ending cash balance of $39,349.06 on August 31, 2025 (*i.e.* two days after the Petition Date).

[39]     The Debtor's Monthly Operating Report did not disclose the nature of the receipts.  Docket No. 68.  However, Exhibit 10 shows most of the receipts were transferred from a related entity: "JRB Service."

[40]     The Debtor's Monthly Operating Report did not disclose the nature of the disbursements.  Docket No. 68.  However, Exhibit 10 shows most of the disbursements were made to "Prepaid Expense Card Solutions, Inc."

[41]     Payment of quarterly fee to United States Trustee.

[42]     Docket No. 68; Ex. 10.

[43]     Docket No. 226 at 21.

[44]     Docket No. 216 at 10.

[45]     Ex. E.

2023.  Per the Debtor, some of the accounts receivable (if paid) may constitute trust funds payable to subcontractors; but the nature and extent of any trust funds claims was not shown by the Debtor.  SMS has a security interest in all accounts receivable.  Given the amount of the debt owed to SMS, there is no path for general unsecured creditors to receive any payments from collection of accounts receivable.

In any event, Messrs. Butler and Calkins testified that they have industry experience, familiarity with the projects on which accounts receivable are owed, and long-standing relationships with the general contractors and subcontractors.  Thus, they contend that the Debtor (as opposed to a Chapter 7 trustee) would best be positioned to collect accounts receivable for the benefit of the Debtor.  Maybe.  But, notably, during the entire nine-month pendency of the Debtor's bankruptcy case, the Debtor has collected zero accounts receivable.[46]  Indeed, the Debtor has not shown that it collected *any* money from accounts receivable since it closed its operations.

Although the Debtor has obtained no positive financial results during this bankruptcy case, on October 28, 2025, the Debtor commenced an Adversary Proceeding against J.E. Dunn and others to collect a $932,698 account receivable allegedly owed by J.E. Dunn to the Debtor:  *J.R. Butler, Inc. v. J.E. Dunn Construction Co., et al. (In re J.R. Butler, Inc.)*, Adv. Pro. No. 25-15598-TBM (Bankr. D. Colo.) (the "J.E. Dunn Adversary Proceeding").  The J.E. Dunn Adversary Proceeding remains pending.  Further, Messrs. Butler and Mr. Calkins testified at trial that they were actively negotiating with other parties who owe the Debtor accounts receivable and that they believed that were close to reaching resolutions with several companies.  However, in the two months since the trial, nothing has been filed with the Court requesting settlement approval.

So, as it stands now, the record shows that the Debtor improperly spent $40,490 in cash collateral on an unauthorized post-petition basis and has incurred $121,635 in unpaid post-petition liabilities.  Such amounts dwarf the Debtor's current cash position: $17,132.  Meanwhile, the Debtor has generated no operating income.

Undoubtedly, the Debtor also has incurred significant administrative expenses for its former and current bankruptcy counsel, Allen Vellone Wolf Helfrich & Factor, P.C. ("Allen Vellone") and Michael Best.  However, the Debtor failed to disclose such administrative expenses on its Monthly Operating Reports or through its Liquidation Plan and Disclosure Statement.  Nevertheless, Allen Vellone filed an Application for approval of compensation in the Amount of $14,835.61, which the Court approved.[47] With respect to Michael Best, Mr. Butler and the Greta Valentinova Calkins 2021 Irrevocable Trust Dated Oct. 1st 2021 apparently are paying Michael Best on an unauthorized basis outside of the bankruptcy process entirely.  Whether intentional or not, such procedure masks (really hides) the Debtor's mounting administrative expenses owed to Michael Best.

---

[46]     Docket Nos. 68, 108, 109, 159, 174, 193, 199, 219, and 226.
[47]     Docket Nos. 190 and 200.

**E.    The Phox One, LLC Transaction.**

Just prior to filing for bankruptcy protection, the Debtor engaged in an unusual transaction with an entity:  Phox One, LLC ("Phox One").  On July 7, 2025, the Debtor sold "all assets owned by J.R. Butler, Inc. located at 8535 Highfield Pkwy, Englewood, CO 80112" to Phox One for $240,000.[48]

Marc Butler (the current Chief Executive Officer of the Debtor) and Matthew Calkins (the current Chief Operating Officer of the Debtor) created Phox One and orchestrated the transaction.  Shortly after the Debtor closed its active operations, on June 24, 2025, Messrs. Butler and Calkins as well as some other employees of the Debtor met at Mr. Butler's ranch to brainstorm ideas for a possible new business venture together.  As part of the discussion, Mr. Butler suggested an "energy opportunity" involving glass and the exterior façades of commercial buildings.  The core concept was to try to make existing commercial buildings more energy efficient by use of energy efficient glass.  The group conferred with a financier and moved quickly.

Messrs. Butler and Calkins formed Phox One as a Colorado limited liability company on June 27, 2025.[49]  Marc Butler owns sixty percent (60%) of Phox One. Phox One obtained an initial loan or equity investment of $2,000,000 to capitalize the company.  The same day the entity was formed, Phox One entered into a lease of the same space formerly used by the Debtor: 8535 Highfield Parkway No. 100, Englewood, Colorado.

Then, Phox One decided to acquire all the Debtor's personal property and equipment at the Debtor's Facility.  On July 7, 2025, the Debtor and Phox One entered into a Bill of Sale.[50]  Mr. Butler signed the Bill of Sale for the Debtor (as Chief Executive Officer) and also for Phox One (as a Member and Manager).  Mr. Calkins also signed for Phox One (as a Manager).  Under the Bill of Sale, the Debtor sold all of its physical personal property (consisting of information technology equipment, furniture, and manufacturing equipment) to Phox One for $240,000.  The Debtor also entered into a license agreement with Phox One allowing Phox One to use the Debtor's intellectual property.  The sale and license agreement were non-arms-length insider transactions. The Debtor did not obtain an appraisal, hire a broker, or conduct an auction for the sale and license of its physical and intellectual property.  The Debtor came up with the sales price based on some internet searches.

Phox One currently operates from the former Debtor's Facility located as 8535 Highfield Parkway No. 100, Englewood, Colorado.  It has 41 employees.  More than 20 of Phox One's employees were former employees of the Debtor.  Phox One has not removed any of the Debtor's former physical property.  Instead, Phox One now uses

---

[48]    Ex. 6 at 7.
[49]    Ex. 7.
[50]    Ex. 8.

such property in its business activities. Phox One's website includes the following statements:[51]

- "We're redefining what's possible in the building envelope industry."

- "Delivering smarter curtain wall solutions for high-performance projects."

- "For decades, we've been the designers, the engineers, the ones standing onsite  . . . ."

- "Our team brings 30+ years across architecture, construction management, and the field."

- "Our journey has taken us from on-site installation to developing patented, high-performance unitized systems."

- "We design & manufacture the best performance building envelope and curtain wall solutions."

- "We design, engineer, and manufacture building envelope solutions . . . ."

The Phox One website contains a list of approximately a dozen "Portfolio" examples.[52] All were projects performed by the Debtor, not Phox One.

Based on the foregoing, the Debtor operated and Phox One now operates in the same construction industry segment: the building envelope industry. The focus was almost the same: designing, engineering, and manufacturing building envelope solutions. Comparing the companies' own descriptions of their work, the main difference seems only to be that Phox One does not install the building envelope or "curtain wall" in commercial buildings as the Debtor did. Furthermore, Phox One does not perform interior glass work and seems more focused on improving energy efficiency. Also, Phox One mainly works with building owners rather than general contractors. But, Phox One uses the same equipment formerly used by the Debtor, employs many of the same employees, and operates out of the same location claiming the Debtor's projects as its own. The Court finds that there are many similarities and some differences between the business formerly conducted by Debtor and now performed by Phox One. However, the Court received no evidence that the Debtor transferred or assigned any of its contracts or business opportunities to Phox One.

---

[51] Ex. 13.
[52] *Id*.

Back to the transaction.  After the Debtor and Phox One executed the Bill of Sale, Phox One paid the Debtor $240,000 on July 22, 2025.  All of the assets sold to Phox One constituted SMS' secured collateral.  Accordingly, the Debtor had no right to sell such collateral and use it without SMS' consent.  But that is exactly what the Debtor did.  Even though the Debtor was no longer operating, it spent (both before and after the Petition Date) at least 90% of the proceeds without paying SMS anything.[53]  It is uncontroverted that the Debtor did not tell SMS and did not obtain its consent.

The nondisclosure is more troubling since the Debtor was in the midst of negotiating a "Forbearance and Note Amendment Agreement" with SMS which was ultimately executed on August 11, 2025 but does not disclose that the Debtor had sold all of its physical assets and intellectual property to Phox One just a few weeks earlier.[54]  Messrs. Butler and Calkins appeared to gloss over the Debtor's improper sale of the collateral to Phox One and use of proceeds by the Debtor by testifying, in essence, that they did not think about or focus on the issue at the time because of everything else happening so quickly.  The Court finds the explanation by Messrs. Butler and Calkins, both sophisticated businessmen with decades of experience, not to be credible.

Neither the Debtor nor SMS provided evidence sufficient for the Court to determine whether or not the $240,000 purchase price was reasonably equivalent value for the assets.  In any event, the Debtor has not pursued or investigated any potential fraudulent transfer claims under Section 548 or State law against Phox ONE in relation to the transaction.  The Debtor has also not attempted to recover any of the assets.

## V.     Legal Analysis.

### A.     General Legal Framework for Conversion under Section 1112(b).

The Motion to Convert is based on Section 1112(b).  Section 1112(b) provides for dismissal or conversion of a bankruptcy case for "cause."  As amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, ("BAPCPA"), Section 1112(b)(1) now states:

> [O]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

---

[53]    Ex. 10.
[54]    Ex. 9.

11

Section 1112(b)(1) was substantially amended by BAPCPA to eliminate some of the Court's discretion and make dismissal or conversion presumptively mandatory if cause is demonstrated.[55]

Based on the statutory text, dismissal or conversion of a Chapter 11 case under 1112(b)(1) is a two-step process:

> First, the Court must determine whether 'cause' exists for dismissal or conversion of the [C]hapter 11 case.  Next, the Court must determine whether dismissal or conversion of the case is in the best interests of the creditors and the estate.

*In re OptInRealBig.com LLC*, 345 B.R. 277, 282 (Bankr. D. Colo. 2006).

### 1.  Cause.

Typically, the main fight under Section 1112(b)(1) is whether cause can be demonstrated.  Section 1112(b)(4) lists sixteen illustrative examples of cause for conversion or dismissal.  More specifically, the statute states "the term 'cause' includes" and then identifies examples.  These statutory examples are sometimes referred to as "enumerated causes."  However, while the statute lists sixteen enumerated causes for dismissal or conversion, the listing is not exclusive or restrictive.  *Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir. 1989) (stating that the Section 1112(b) list "is not

---

[55]     There is a narrow exception to presumptive dismissal or conversion if cause is shown.  Section 1112(b)(2) states:

> The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that —
>
> (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and
>
> (B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A) —
>
>          (i) for which there exists a reasonable justification for the act or omission; and
>          (ii) that will be cured within a reasonable period of time fixed by the court.

The Debtor has not argued that Section 1112(b)(2) "unusual circumstances" apply and has not identified any such "unusual circumstances."  Furthermore, the Debtor has not argued or established that "there is a reasonable likelihood that a plan will be confirmed . . . within a reasonable period of time . . . ."  Indeed, as of the trial on the Motion to Convert, the Debtor had not even filed a plan and disclosure statement.  Accordingly, the "unusual circumstances" exception under Section 1112(b)(2) does not apply.

exhaustive").  The Court may dismiss or convert for causes other than the enumerated causes because Section 1112(b)(1) is flexible and gives the Court broad discretion to determine whether cause for dismissal or conversion exists.  *In re Autterson*, 547 B.R. 372, 409 (Bankr. D. Colo. 2016); *In re Pac. Rim Invs., LLP*, 243 B.R. 768, 772 (Bankr. D. Colo. 2000).  But again, if cause is demonstrated, then dismissal or conversion is presumptively mandatory.

The most frequently-asserted non-enumerated cause for Section 1112(b) dismissal or conversion is lack of good faith.  Good faith is a central requirement for the entire Chapter 11 reorganization exercise.  The requirement of "good faith prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes." *Little Creek Dev. Co. v. Commonwealth Mort. Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1072 (5th Cir. 1986).

Every Circuit Court of Appeals that has considered the question has decided that lack of good faith — even though unenumerated in Section 1112(b)(4) — is grounds for dismissal or conversion.  *See LTL Mgmt., LLC v. Those Parties Listed on Appendix A (In re LTL Mgmt., LLC)*, 64 F.4th 84, 100 (3d Cir. 2023) ("Chapter 11 bankruptcy petitions are 'subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith.'"); *In re SGL Carbon Corp.*, 200 F.3d 154, 160 (3d Cir. 1999) ("[T]he courts of appeals that have considered the issue have held that the absence of good faith constitutes 'cause' to dismiss a Chapter 11 petition under § 1112(b)."); *Trident Assocs. Ltd. P'ship v. Metro. Life Ins. Co. (In re Trident Assocs. Ltd. Partnership)*, 52 F.3d 127, 130 (6th Cir. 1995) (holding that "debtor bad faith can constitute cause" under Section 1112(b)); *Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 828 (9th Cir. 1994) ("Although section 1112(b) does not explicitly require that cases be filed in 'good faith,' courts have overwhelmingly held that a lack of good faith in filing a Chapter 11 petition establishes cause for dismissal."); *Humble Place Joint Venture v. Fory (In re Humble Place Joint Venture)*, 936 F.2d 814, 816-17 (5th Cir. 1991) (noting that a debtor's lack of good faith in filing constitutes cause under Section 1112(b) and citing *Little Creek*, 779 F.2d at 1072).

In this jurisdiction, lack of good faith has been accepted as a cause justifying dismissal or conversion under Section 1112(b) for many years.  *Bird v. Dahlstrom (In re Dahlstrom)*, 963 F.2d 382, 1992 WL 112238, at *2 (10th Cir. May 22, 1992) (unpublished) ("We also recognize that lack of good faith may constitute 'cause' under § 1112(b)."); *Winslow v. Williams Group (In re Winslow)*, 949 F.2d 401, 1991 WL 261696, at *2 (10th Cir. Dec. 6 1991) (unpublished) ("[B]ankruptcy courts may convert cases under § 1112(b) when a debtor engages in bad faith conduct."); *Muth v. Muth (In re Muth)*, 514 B.R. 719, 2014 WL 1712527, at *5 (10th Cir. BAP May 1, 2014) (unpublished) ("'Although a debtor's bad faith in filing a petition is not an enumerated ground for dismissal under § 1112(b), courts have overwhelmingly held that proof of such an allegation may be 'cause' for dismissal.'") (citation omitted); *Pac. Rim Inves.*, 243 B.R. at 771 ("It is well established under the Bankruptcy Code, as it was under the Bankruptcy Act, that a Chapter 11 petition must be filed in good faith, and if not,

13

dismissal of the case is an appropriate remedy."). Other more recent Colorado decisions confirming lack of good faith as a basis for dismissal under Section 1112(b) include: *In re Platte River Bottom*, 2016 WL 241464, at *6 (Bankr. D. Colo. Jan. 20, 2016); and *In re eFusion Servs., LLC*, 2014 WL 5293415, at *2 (Bankr. D. Colo. Oct. 16, 2014). In the Motion to Convert and Objection, SMS and the Debtor both agreed that lack of good faith may serve as a legal basis for dismissal or conversion under Section 1112(b). The Court concurs.

But, that leads to the next question: How should the Court determine whether the Debtor has engaged in lack of good faith sufficient to mandate dismissal or conversion under Section 1112(b)? The answer is an assessment of the totality of the circumstances. *See In re 15375 Mem'l Corp. v. BEPCO, L.P.*, 589 F.3d 605, 618 (3d Cir. 2009) (Section 1112(b) standard to establish good faith or lack thereof is the "totality of facts and circumstances"); *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 118 (3d Cir. 2004) ("Whether the good faith requirement has been satisfied is a 'fact intensive inquiry' in which the court must examine 'the totality of the facts and circumstances . . . .'"); *Platte River,* 2016 WL 241464, at *4 ("Courts always evaluate the totality of the circumstances to determine if cause exists to dismiss or convert a chapter 11 case under § 1112(b)."); *eFusion Servs.*, 2014 WL 5293415, at *2 (noting applicability of totality standard). This means that "courts, in general, consider any factors which indicate that a petition was filed to abuse the purposes of the Bankruptcy Code, or to delay or frustrate the legitimate efforts of creditors to enforce their rights." *Winslow*, 1991 WL 261696, at *2. The totality of the circumstances standard is a broad framework; but it is necessary in the Section 1112(b) context. Bankruptcy Judge Tallman explained why:

> Chapter 11 cases vary widely and do not lend themselves to a cookie cutter approach to analyzing bad faith of a bankruptcy filing. As a consequence, bad faith, in the context of a Chapter 11 filing as in most other bankruptcy contexts, is always determined on a case by case basis.

*In re Springs Hosp., Inc.*, 2006 WL 2458679, at *3 (Bankr. D. Colo. Aug. 22, 2006).

To facilitate an assessment of the totality of the circumstances under Section 1112(b), courts have identified a myriad of potentially relevant factors which may be considered depending on the case. Among the "numerous indicia that constitute classic badges of bad faith filing," the Tenth Circuit noted the following:

> [The Debtor] (1) has only one asset; (2) has only one creditor; (3) acquired property which was posted for foreclosure and the prior owners had been unsuccessful in defending against the foreclosure; (4) was revitalized on the eve of foreclosure to acquire the insolvent property; (5) has no ongoing business or employees; (6) lacks a reasonable

14

possibility of reorganization; and (7) the Chapter 11 filing
stopped the foreclosure.

*Udall v. F.D.I.C. (In re Nursery Land Dev., Inc.)*, 91 F.3d 1414, 1416 (10th Cir. 1996)
(citations omitted).  Courts have identified other factors such as: (1) the debtor has no
employees; (2) the debtor has little or no cash flow; (3) there are no available sources of
income to sustain a plan; (4) the debtor does not intend to rehabilitate; (5) there are few,
if any, unsecured creditors; and (6) the debtor and a creditor have proceeded to a
stand-still in state court litigation.  *Platte River*, 2016 WL 241464, at *9 and *11; *Springs
Hosp.*, 2006 WL 2458679, at *3.

Overall, the Court needs to step back and consider whether "the totality of the
circumstances, paints a factual picture leading to the inescapable conclusion that use of
the bankruptcy laws by the debtor is inappropriate." *eFusion Servs.*, 2014 WL 5293415,
at *2.  At that fundamental level, two other inquires may be particularly important on the
issue of good faith: "(1) whether the petition serves a valid bankruptcy purpose; and (2)
whether [it] is filed merely to obtain a tactical litigation advantage." *BEPCO*, 589 F.3d at
618.  *See also Integrated Telecom*, 384 F.3d at 120 (citing *SGL Carbon*, 200 F.3d at
165); *LTL Mgmt.*, 64 F.4th at 100-01 (citing *Integrated Telecom*).  With respect to
bankruptcy purpose, "a debtor who does not suffer from financial distress cannot
demonstrate its Chapter 11 petition serves a valid bankruptcy purpose supporting good
faith." *LTL Mgmt.*, 64 F.4th at 101.  And, regarding litigation advantage, where "the
primary, if not sole, purpose of the filing was a litigation tactic, the petition may be
dismissed as not being filed in good faith." *SGL Carbon*, 200 F.3d at 165.

Generally, the movant asserting a Section 1112(b) motion bears the burden of
proof to show cause for dismissal or conversion by a preponderance of the evidence. *In
re Whetten*, 473 B.R. 380, 382 (Bankr. D. Colo. 2012).  Both SMS and the Debtor agree
that the initial burden of proof is on SMS.  However, with respect to good faith, "[o]nce at
issue, the burden to establish good faith is on the debtor." *LTL Mgmt.*, 64 F.4th at 100.
*See also SGL Carbon*, 200 F.3d at 162 n.10 ("Once at issue, the burden falls upon the
bankruptcy petitioner to establish that the petition has been filed in 'good faith.'");
*Integrated Telecom*, 384 F.3d at 118 ("the burden is on the bankruptcy petitioner to
establish that its petition was filed in good faith" (citing *SGL Carbon*)); *In re Fox*, 232
B.R. 229, 233 (Bankr. Kan. 1999) ("As a general rule, the movant bears the burden of
proving by a preponderance of the evidence that cause exists for dismissal of a debtor's
bankruptcy case.  However, when lack of good faith is raised as a basis for dismissal for
cause [under Section 1112(b)], the debtor bears the ultimate burden of proving that the
filing was made in good faith.") (citations omitted).

## 2.    Dismissal v. Conversion.

If cause is proved, the Court must select as between dismissal or conversion
based upon the "best interests of creditors and the estate."  11 U.S.C. § 1112(b)(1).
Notably, the statutory language does not refer to a debtor's best interests.  The case
law construing Section 1112(b)(1) universally indicates that the Debtor's interest is

15

irrelevant.  For example, in *In re Sullivan*, 626 B.R. 326, 335 (Bankr. D. Colo. 2021), Bankruptcy Judge Brown observed that "the statute instructs the Court to weigh the best interests of the creditors and the estate, not the Debtor . . . and . . . the Court is not required to consider the debtor's best interest . . . ."  *Id.* at 335.  *See also In re Helmers*, 361 B.R. 190, 197 (Bankr. D. Kan. 2007) ("What happens to the debtors is not really relevant.").

There is "no 'bright-line test to determine [whether] conversion or dismissal is in the best interests of creditors and the estate.'"  *In re DB Cap. Holdings, LLC*, 2011 WL 5520439, at *3 (Bankr. D. Colo. Nov. 11, 2011) (quoting *In re Westhampton Coachworks, Ltd.*, 2010 WL 5348422, at *6 (Bankr. E.D.N.Y. Dec. 21, 2010)) (brackets in *DB Cap.*).  Instead,

> [T]he decision whether to convert to Chapter 7 or to dismiss is committed to the discretion of the bankruptcy court.  The standard for choosing conversion or dismissal based on "the best interest of creditors and the estate" implies a balancing test to be applied through case-by-case analysis.  The element of the best interest of creditors requires the Court to consider which alternative would be most advantageous to the parties.  The element of the best interest of the estate focuses upon whether the economic value of the estate is greater inside or outside of bankruptcy.

*In re Gateway Ethanol, LLC*, 2011 WL 597059, at *2 (Bankr. D. Kan. Feb. 11, 2011) (internal citations omitted).  Per the Tenth Circuit, "a bankruptcy court has broad discretion to convert a Chapter 11 case to a Chapter 7 proceeding or to dismiss a case" under Section 1112(b)(1).  *Small Bus. Admin. v. Preferred Door Co., Inc. (In re Preferred Door Co, Inc.)*, 990 F.2d 547, 549 (10th Cir. 1993).

**B.      Application of the Law to the Facts:  Conversion to Chapter 7 is Warranted.**

      **1.      SMS Established Cause for Conversion.**

Through the Motion to Convert, SMS requests that the Court dismiss or convert the Debtor's bankruptcy case from Chapter 11 to Chapter 7 for cause under Section 1112(b)(1).  SMS raised only one enumerated cause (Section 1112(b)(4)(A)) and one unenumerated cause (lack of good faith) for dismissal or conversion.  SMS belatedly raised other enumerated causes during the trial.  However, as the Court reaches its conclusion without addressing them, those causes need not be discussed.

      **a.      SMS Has Established an Enumerated Cause for Dismissal or Conversion under Section 1112(b)(4)(A).**

Section 1112(b)(4) lists sixteen illustrative examples of cause for dismissal or conversion.  The only enumerated cause expressly identified by SMS in the Motion to Convert is Section 1112(b)(4)(A) which provides:

> For purposes of this subsection, the term "cause" includes —
> . . . .
>
> (A)     substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation . . . .

Looking a little more closely at the language of Section 1112(b)(4)(A), there are two elements: (1) a showing of substantial or continuing loss to or diminution of the estate; and (2) absence of a reasonable likelihood of rehabilitation.  *In re Vaughan Co., Realtors*, 2013 WL 2244285 at *5 (Bankr. D.N.M. 2013).  "This requirement is in the conjunctive and it clearly is the burden of the movant to prove both of these elements." *In re Lykes Bros. S.S. Co., Inc.,* 196 B.R. 586, 595 (Bankr. M.D. Fla. 1996).

The first part of the statutory test focuses on whether the Debtor has suffered or continues to suffer negative cash flow or declining asset values resulting in loss to or diminution of the estate.  In *Vaughan*, the court determined that the court should assess:  "the bankruptcy estate's financial history and financial prospects and the financial records on file in the case."  *Vaughan*, 2013 WL 2244285 at *6.

SMS has shown that the Debtor has suffered "a substantial or continuing loss to or diminution of the estate."  The Debtor entered bankruptcy with $39,349 in cash.  Such amount has been reduced in half over the nine-month term of this bankruptcy case to $17,132.  The loss may seem fairly nominal given the amount of claims against the Debtor.  However, the main point is: *the Debtor is not operating and has generated no income during the bankruptcy case.*  (The only receipts identified by the Debtor on the Monthly Operating Reports are for some transfers from an affiliate in September 2025.)  Although the Debtor contends that it is owed accounts receivable, it has not collected any.  And some of the accounts receivable date back to 2023.

In addition to review of the actual receipts and disbursements, Section 1112(b)(4)(A) analysis of "substantial or continuing loss to or diminution of the estate" also requires consideration of accrued and unpaid post-petition expenses.  *See Morreale v. 2011-SIP-1 CRE/CADC Venture, LLC*, 533 B.R. 320, 324 (D. Colo. 2015) ("Fully evaluating the present condition of a bankruptcy estate surely involves looking at accruing liabilities, even if the exact amount of those liabilities has yet to be determined."); *Andover Covered Bridge, LLC v. Harrington (In re Andover Covered Bridge, LLC)*, 553 B.R. 162, 175 (1st Cir. BAP 2016) ("Courts have held that a Debtor's post-petition negative cash flow and/or inability to pay current expenses satisfies the elements of § 1112(b)(4)(A)."); Richard Levin and Henry J. Sommer, 7 COLLIER ON BANKRUPTCY ¶ 1112.04[6][a][1] (Lexis Nexis Pub. 16th Ed. Supp. 2022) [hereinafter, "COLLIER ON BANKRUPTCY"] ("In the case of a non-operating debtor, continued accrual of

17

administrative expenses without corresponding income may constitute substantial or continuing loss as contemplated by Section 1112(b)(4)(A).").  That is because "any negative cash flow — including that resulting only from administrative expenses — effectively comes straight from the pockets of creditors.  This is enough to satisfy the first element of § 1112(b)(1)." *Loop Corp. v. U.S. Tr.*, 379 F.3d 511, 516 (8th Cir. 2004).  The Debtor's most recent Monthly Operating Report (for the period ending April 30, 2026)[56] shows that the Debtor has incurred $121,635 in "post-petition liabilities" that it has not paid.  The amount is significant, material, and continuing.

The post-petition liabilities identified by the Debtor include $27,096 in fees owed to the Debtor's accountant, CliftonLarsonAllen, LLP ("CliftonLarson"), for services rendered sometime in 2025.  On December 12, 2025, the Court approved the Debtor's retention of CliftonLarson under Section 327(a).[57]  However, CliftonLarson has not submitted a fee application.  So, there is a strong probability that the Debtor owes CliftonLarson even more than $27,096.74.  The Debtor also acknowledges that it owes Nelson Mullins $19,441 for post-petition work which it has not paid.  That is very odd.  Melson Mullins is a well-known law firm.  Apparently, Nelson Mullins is working for the Debtor.  However, such work is being performed improperly without Court approval under Section 327(a) or (e).  Indeed, the Debtor never filed an application to employ Nelson Mullins.

That brings us to the Debtor's principal bankruptcy counsel.  Allen Vellone started the bankruptcy case.  Allen Vellone filed an Application for approval of compensation in the Amount of $14,835.61, which the Court approved.[58]  But, the Debtor's Monthly Operating Reports do not show, as they are required to do, whether such amount was paid.  Then, after Allen Vellone merged with Michael Best, the Debtor switched to Michael Best as its main bankruptcy counsel.  Based on the Court's knowledge of the bankruptcy case and participation in Court hearings including the trial, Michael Best has rendered substantial legal services to the Debtor.  However, inexplicably, Michael Best has not filed an application for compensation yet.  And, the Debtor's Monthly Operating Reports do not show the post-petition liabilities owed to Michael Best.  The Court was surprised to learn at the trial and in the Debtor's post-trial Disclosure Statement that:  "Since the Petition Date, non-Debtor parties Marc Butler and the Greta Valentinova Calkins 2021 Irrevocable Trust Dated Oct. 1st 2021 have paid certain Administrative Expenses of the Debtor, including Professional fees."[59]  Having previously-undisclosed third-parties pay the Debtor's legal fees raises propriety issues under Section 327 and 330.  Michael Best is not entitled to payment of any legal fees unless and until the Court approves the payment of such legal fees after application under Section 330.  What seems to be happening is that the Debtor is obfuscating and hiding the actual amount of accrued post-petition administrative expenses incurred by the Debtor.  And there is a strong probability that such fees are significant.

---

[56]     Docket No. 226.
[57]     Docket No. 138.
[58]     Docket Nos. 190 and 200.
[59]     Docket No. 216 at 10.

18

In any event, even ignoring the issues with Allen Vellone and Michael Best, the facts show that the Debtor has lost money on a cash flow basis and has incurred at least $121,635.67in new unpaid post-petition debt.  Since the Debtor is not operating, the Debtor will not be generating any regular periodic monthly revenue.  Indeed, it has not done so since the beginning of the bankruptcy case nine months ago.  And, the Debtor has not collected any accounts receivable either (even though some accounts receivable date back to 2023 and all of such accounts receivable are over nine months old).[60]  Although the Debtor might be able to collect some accounts receivable in the future through litigation or otherwise, that does not mitigate the demonstrated substantial and continuing loss to the estate.  SMS has met its burden to prove that such loss constitutes cause under Section 1112(b)(1).  *See Loop*, 379 F.3d at 516 (affirming bankruptcy court's finding of cause to dismiss or convert under Section 1112(b) because of negative cash flow and accruing and unpaid administrative expenses); *Morreale*, 533 B.R. at 324 (affirming conversion from Chapter 11 to Chapter 7; "the facts before the bankruptcy court showed an attorneys' fees bill of about $150,000.00 for roughly fourteen months of . . . a 'non-operating Chapter 11' . . . .").

The second part of Section 1112(b)(4)(A) concerns the "absence of a reasonable likelihood of *rehabilitation*."  (Emphasis added.)  Notably, Congress did not refer to a likelihood of "reorganization" in Section 1112(b)(4)(A).  There is a distinction.  "Rehabilitation" does not mean "reorganization."  Instead, "'rehabilitation' is a different and, unfortunately for Debtor, much more demanding standard than 'reorganization.'"  *In re Brutsche*, 476 B.R. 298, 302 (Bankr. D. N.M. 2012).  In the context of Chapter 11 business bankruptcies, the term "rehabilitation" means to put back in sound financial condition and continue operating.

The Eighth Circuit Court of Appeals decision in *Loop*, 379 F.3d 511, is the leading appellate authority on the issue.  In *Loop,* the appellate panel held:

> . . . the bankruptcy court did not err in concluding that a liquidating debtor who had no intention of restoring its business had no reasonable likelihood of rehabilitation. Courts have consistently understood "rehabilitation" to refer to the debtor's ability to restore the viability of its business. *See, e.g., In re Gonic Realty Trust,* 909 F.2d at 627 ("[W]ith no business left to reorganize, Chapter 11 proceedings were not serving the purpose of rehabilitating the debtor's business."); *In re The Ledges Apartments,* 58 B.R. 84, 87 (Bankr. D. Vt.1986) ("Reorganization encompasses rehabilitation and may contemplate liquidation. Rehabilitation, on the other hand, may not include liquidation."); *In re Wright Air Lines, Inc.,* 51 B.R. 96, 100 (Bankr. N.D. Ohio 1985) ("Rehabilitation as used in 11 U.S.C. Section 1112(b)(1) means to put back in good condition; re-establish on a firm, sound basis.") . . . .

---

[60]     Docket No. 226 at 19-20.

> Because the debtors here intended to liquidate their assets rather than restore their business operations, they had no reasonable likelihood of rehabilitation.

*Id.* at 516.  As SMS correctly argues, decisions (like *Loop*) determining that "rehabilitation" does not include liquidation are legion.  *In re Creekside Senior Apartments, L.P.*, 489 B.R. 51, 61 (6th Cir. BAP 2013) (citing numerous decisions for proposition that liquidation does not constitute rehabilitation); *Andover Covered Bridge*, 553 B.R. at 175 ("rehabilitation for purposes of § 1112(b) does not include liquidation"); *In re Costa Bonia Beach Resort Inc.*, 479 B.R. 14, 43 (Bankr. D. P.R. 2012) (rehabilitation does not include liquidation).  The leading bankruptcy treatise is in accord and advises:

> . . . the standard under Section 1112(b)(4)(A) is not the technical one of whether the debtor can confirm a plan, but, rather, whether the debtor's business prospects justify continuance of the reorganization effort.  Rehabilitation is not another word for reorganization.  Rehabilitation means to reestablish a business.  Whereas confirmation of a plan could include a liquidation plan, rehabilitation does not include liquidation.

7 COLLIERS ON BANKRUPTCY ¶ 1112.04[6][a][ii] (internal citations omitted).

After the trial, the Debtor belatedly proposed a Liquidation Plan.  The Debtor has no employees, no physical location, no equipment, and no physical property.  Recall that the Debtor laid off all of its employees over a year ago (on June 6, 2025).  And the Debtor sold all of its physical property located at the Debtor's Facility and all of its intellectual property to Phox One on July 7, 2025.  The Debtor has no intention of continuing to operate as an ongoing business enterprise.  The Debtor has nothing left except its accounts receivable which it proposes to liquidate through litigation (including the J.E. Dunn Adversary Proceeding and otherwise) and negotiation or settlement.  The Debtor argues that "the Code expressly permits debtors to propose liquidating plans."[61] Sobeit.  However, while a debtor may be able to propose and confirm a liquidating plan, that is something entirely different than rehabilitation under Section 1112(b)(4)(A).  The Court finds that that SMS has met its burden to show "the absence of a reasonable likelihood of rehabilitation."

As noted previously, Section 1112(b)(4)(A) has two elements: (1) a showing of substantial or continuing loss to or diminution of the estate; and (2) absence of a reasonable likelihood of rehabilitation.  *Vaughan*, 2013 WL 2244285 at *5.  Since SMS has proven both elements, cause for dismissal or conversion has been proven.  Per

---

[61]   Docket No. 218 at 2.

Section 1112(b)(1), the Court is required to dismiss or convert this bankruptcy case.[62] The Court has no discretion on the matter.

### b.    <u>The Unenumerated Lack of Good Faith Argument.</u>

In addition to requesting dismissal or conversion under Sections 1112(b)(1) and (b)(4)(A), SMS also contends that the Court should convert this bankruptcy case because the Debtor has not acted in good faith.  As noted previously, a debtor's lack of good faith in filing for bankruptcy protection and lack of good faith in the bankruptcy process may serve as an unenumerated cause justifying dismissal or conversion under Section 1112(b)(1).  *Dahlstrom*, 963 F.2d 382 at *2 ("We also recognize that lack of good faith may constitute 'cause' under § 1112(b)."); *Winslow*, 1991 WL 261696, at *2 ("[B]ankruptcy courts may convert cases under § 1112(b) when a debtor engages in bad faith conduct."); *Muth*, 514 B.R. 719 at *5 ("Although a debtor's bad faith in filing a petition is not an enumerated ground for dismissal under § 1112(b), courts have overwhelmingly held that proof of such an allegation may be 'cause' for dismissal.").

To support its lack of good faith position, SMS has advanced numerous arguments.  Recall that the Court must engage in a totality of the circumstances approach considering the so-called *Nursery Land* and *Little Creek* factors.  *Nursery Land*, 91 F.3d at 1416; *Little Creek*, 779 F.2d at 1072.  To reiterate, among the "numerous indicia that constitute classic badges of bad faith filing," the Tenth Circuit noted the following:

> [The Debtor] (1) has only one asset; (2) has only one creditor; (3) acquired property which was posted for foreclosure and the prior owners had been unsuccessful in defending against the foreclosure; (4) was revitalized on the eve of foreclosure to acquire the insolvent property; (5) has no ongoing business or employees; (6) lacks a reasonable possibility of reorganization; and (7) the Chapter 11 filing stopped the foreclosure.

*Nursery Land*, 91 F.3d at 1416.  Courts have identified other factors such as: (1) the debtor has no employees; (2) the debtor has little or no cash flow; (3) there are no available sources of income to sustain a plan; (4) the debtor does not intend to rehabilitate; (5) there are few, in any unsecured creditors; and (6) the debtor and a creditor have proceeded to a stand-still in state court litigation.  *Platte River*, 2016 WL 241464, at *9 and *11; *Springs Hosp.*, 2006 WL 2458679, at *3.  Not all the factors are relevant in every case.

Some of the foregoing factors cut in favor of the Debtor and against a finding of bad faith or are not applicable to this case.  *First*, the Debtor does not have "only one asset."  It asserts accounts receivable owed by more than a dozen counterparties.

---

[62]    As explained earlier, the "unusual circumstances" exception under Section 1112(b)(2) does not come into play.

*Second*, the Debtor most assuredly does not have "only one creditor."  On the contrary, on its Schedules D and E/F, the Debtor identified dozens and dozens of creditors.  Subsequently, 126 secured, priority, and unsecured creditors filed proofs of claim aggregating $66,915,226.  *Third*, this bankruptcy case does not involve typically problematic foreclosure issues such as that the Debtor "acquired property which was posted for foreclosure and the prior owners had been unsuccessful in defending against the foreclosure" or the Debtor "was revitalized on the eve of foreclosure to acquire the insolvent property" or "the Chapter 11 filing stopped the foreclosure."  *Fourth*, this bankruptcy proceeding does not present the circumstances of "the debtor and a creditor hav[ing] proceeded to a stand-still in state court litigation."  And there is no evidence of the Debtor's using bankruptcy to secure a tactical litigation advantage.

But the Court has serious good faith concerns, including the arguments raised by SMS.  SMS is correct that the Debtor currently has a small amount of cash and no positive cash flow.  And, as set forth above, the Debtor has no intent to rehabilitate.  After all, the Debtor has no employees, no physical location, no equipment, and no physical property.  Furthermore, the Debtor has not collected any of its accounts receivable since the bankruptcy case commenced nine months ago.  All that certainly suggests lack of good faith.

Turning to the totality of the circumstances, the Court also is concerned about other issues.  The Debtor engaged in an unusual and suspect transaction just prior to the Petition Date.  On July 7, 2025, the Debtor sold all of its physical property located at the Debtor's Facility, together with all of its intellectual property, to Phox One for $240,000.  The property was SMS' collateral.  But the Debtor hid the transaction from SMS and did not pay SMS anything.  Phox One is owned by the Debtor's insiders (Marc Butler and Matthew Calkins and/or their associated trusts).  And at least 20 of Phox One's employees were formerly employees of the Debtor.  The Debtor did not obtain an appraisal, hire a broker, or conduct an open auction for the property to ensure that the Debtor received reasonably equivalent value for the sale of its property.  The speed of the transaction does not excuse the failure to conduct basic due diligence.  Furthermore, Phox One now occupies the Debtor's Facility under a new lease using the Debtor's former equipment.  Phox One operates in the same construction industry segment as the Debtor did: the building envelope industry.  The foregoing calls out for investigation including whether the Debtor may have legal claims (for fraudulent conveyance or otherwise) against Phox One.

Also, the Court questions the Debtor's post-petition conduct.  During the bankruptcy case, the Debtor used SMS' cash collateral without SMS' consent and without Court approval as required under Section 363(c)(2).  The Debtor's Monthly Operating Reports show that it has incurred a post-petition debt to Nelson Mullins.  But the Debtor did not seek or obtain Court approval for hiring Nelson Mullins under Section 327 and 330.  The Debtor also has not been forthcoming in disclosing the accrual and payment of post-petition professional fees for its other attorneys: Allen Vellone and Michael Best.  At the trial and afterward, the Debtor first mentioned that third-parties

22

may be paying "certain" professional fees of the Debtor.  That new information may raise disclosure and conflicts issues.

However, while the Court has substantial concerns about the Debtor's possible lack of good faith, in an exercise of judicial discretion and economy the Court refrains from making a definitive lack of good faith determination now.  It is unnecessary to decide the issue because, as set forth previously, the Court must dismiss or convert the bankruptcy case under Sections 1112(b)(1) and (b)(4)(A).

### 2.      Conversion v. Dismissal.

Having decided that there is cause to dismiss or convert the Debtor's bankruptcy case, the Court must determine which remedy is "in the best interests of creditors and the estate" under Section 1112(b)(1).  Notably, the statutory language does not refer to a debtor's best interests.  The case law construing Section 1112(b) universally indicates that the Debtor's interest is irrelevant.  *Sullivan*, 626 B.R. at 335; *Helmers*, 361 B.R. at 196.  And, besides, the Debtor has not taken a position as between dismissal or conversion anyway.  In the Motion to Convert, SMS initially requested either dismissal or conversion without expressing a preference.  However, at trial, SMS advocated for conversion from Chapter 11 to Chapter 7.  Later, another creditor, J.E. Dunn, also expressed a preference for conversion rather than dismissal.  No other creditors have weighed in.

Reverting back to the statutory language in Section 1112(b)(1), the Court has two main considerations: "the best interests of creditors" and the "best interests of the estate."  The first statutory phrase (*i.e.,* the best interests of creditors) focuses on "the interests of the creditor body as a whole."  *OptInRealBig.com*, 345 B.R. at 290.  Generally, "the creditors are the best judge of their own best interests."  *Camden Ordnance Mfg. Co. of Ark., Inc. v. U.S. Tr. (In re Camden Ordnance Mfg. Co. of Ark., Inc.)*, 245 B.R. 794, 802 (E.D. Penn. 2000); *see also Gollaher v. U.S. Tr.,* 463 B.R. 142, at *4 (10th Cir. BAP 2011) ("Courts also consider the preferences expressed by creditors for either dismissal or conversion as they are the best judge of their own interests.").

The second statutory phrase (*i.e.,* the best interests of the estate), focuses on economic value.  *OptInRealBig.com*, 345 B.R. at 290.  Courts may consider a multitude of factors such as:

> (1) whether some creditors received preferential payments, whether equality of distribution would be better served by conversion rather than dismissal; (2) whether there would be a loss of rights granted in the case if it were dismissed rather than converted; (3) whether the debtor would simply file a further case upon dismissal; (4) the ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors; (5) in assessing the interest of the estate, whether

conversion or dismissal of the estate would maximize the estate's value as an economic enterprise; (6) whether any remaining issues would be better resolved outside the bankruptcy forum; (7) whether the estate consists of a "single asset"; (8) whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests; (9) whether a plan has been confirmed and whether any property remains in the estate to be administered; and (10) whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns.

*Helmers*, 361 B.R. 196-97.  The Tenth Circuit Bankruptcy Appellate Panel tacitly approved use of the *Helmer* factors in *Gollaher,* 463 B.R. 142, at n.25.  *See also In re Sandia Resorts, Inc.*, 562 B.R. 490, 496 (Bankr. N.M. 2016) (adding another three factors the court may consider for the choice between dismissal and conversion).  Not all of the foregoing factors are necessarily applicable in any specific case, no factor is necessarily determinative, and the Court need not give the same weight to each factor.

Despite the identification of the foregoing factors, there is "no 'bright-line test to determine [whether] conversion or dismissal is in the best interests of creditors and the estate.'" *DB Cap. Holdings*, 2011 WL 5520439, at *3.  Per the Tenth Circuit, "a bankruptcy court has broad discretion to convert a Chapter 11 case to a Chapter 7 proceeding or to dismiss a case" under Section 1112(b).  *Preferred Door*, 990 F.2d at 549.

Exercising its discretion, the Court finds that conversion to Chapter 7 serves the best interests of creditors.  SMS and J.E. Dunn are the only creditors to have stated their preference.  And they both prefer conversion to dismissal.  SMS and J.E. Dunn are two of the largest creditors in the bankruptcy case and together represent a material portion of the entire creditor pool.  SMS is an under-secured secured creditor.  J.E. Dunn is an unsecured creditor.  Both are sophisticated commercial enterprises.  The Court recognizes that creditors are "the best judge of their own interests."  *Gollaher,* 463 B.R. 142, at *4.

The second statutory phrase (*i.e.,* the best interests of the estate), focuses on economic value and benefit to the estate.  The Court has considered the *Helmers* factors' application to the issue.  *Helmers*, 361 B.R. 196-97.  Most of the factors are not particularly relevant or applicable.  However, the Court decides that conversion to Chapter 7 liquidation ultimately serves the best interest of the estate.  Conversion ensures the appointment of an independent Chapter 7 trustee who will be responsible for liquidating the assets of the estate and distributing funds to creditors.  11 U.S.C. §§ 704 and 726.  One of the bread-and-butter functions of a Chapter 7 trustee in a business case is to liquidate accounts receivable and other contract claims.  Furthermore, as a neutral, a Chapter 7 trustee would be in the best position to investigate and consider whether any action is appropriate regarding the Phox One

24

transaction with the Debtor or any possibly preferential payments.  Such claims may be lost through dismissal.  A Chapter 7 trustee also may evaluate the propriety of post-petition administrative expense claims.

Based upon the foregoing, the Court determines that conversion from Chapter 11 reorganization to Chapter 7 liquidation would be in the "the best interests of creditors" and the "best interests of the estate" rather than dismissal.

## VI.    Conclusion.

SMS met its burden to show cause for dismissal or conversion of the Debtor's case under Section 1112(b)(1) and 1112(b)(4)(A).

Accordingly, the Court GRANTS the Motion to Convert and converts this bankruptcy case to a Chapter 7 liquidation, effective immediately.

It is further ORDERED that:

1.    The United States Trustee shall appoint a Chapter 7 Trustee to administer the estate.

2.    The Debtor shall:

a.    forthwith turn over to the Chapter 7 Trustee all records and property of the estate under his custody and control as required by Fed. R. Bankr. P. 1019(4);

b.    within 14 days of the date of entry of this Order, file a schedule of all unpaid debts incurred after the commencement of the Chapter 11 case, including the name and address of each creditor, as required by Fed. R. Bankr. P. 1019(5)(A)(i); and

c.    within 30 days following the entry of this Order, file and transmit to the United States Trustee a final report and account, as required by Fed. R. Bankr. P. 1019(5)(A)(ii).

3.    Within 14 days of the date of entry of this order, the Debtor shall file the statements and schedules required by Fed. R. Bankr. P. 1019(1)(A) and 1007(b), if such documents have not already been filed.

4.    Within 30 days of the date of entry of this Order, or before the first date set for the meeting of creditors, whichever is earlier, the Debtor shall, if required, file a statement of intention with respect to retention or surrender of property securing consumer debts, as required by Section 521(a)(2)(A) and Fed. R. Bankr. P. 1019(1)(B), and conforming to Official Bankruptcy Form 108.

It is further ORDERED that pursuant to Fed. R. Bankr. P. 1019(4), the Debtor, its agents, servants, employees, and attorneys are herein enjoined from taking any action with respect to any assets or records of the Debtor, save and except to preserve the same and forthwith to turn over the same to the Chapter 7 trustee appointed herein.

DATED this 18th day of June, 2026.

BY THE COURT:

Thomas B. McNamara,
United States Bankruptcy Judge